# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES WEI and YANXIN ZHANG, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JESSE LEVINSON, AICHA EVANS, HEIDI ROIZEN, DANIEL COOPERMAN, LAURIE YOLER, CARL BASS, MICHAEL CANNON-BROOKES, ZU LIU HU, CHRISTOPHER NALEVANKO, ZOOX, INC., and AMAZON.COM, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2023-0521-KSJM |

## MEMORANDUM OPINION

Date Submitted: October 17, 2024
Date Decided: June 3, 2025

Christopher H. Lyons, Tayler D. Bolton, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Joel Friedlander, Jeffrey M. Gorris, David Hahn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Randall J. Baron, David A. Knotts, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; *Counsel for Plaintiffs James Wei and Yanxin Zhang.*

Garrett B. Moritz, Benjamin M. Whitney, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; William Savitt, Anitha Reddy, Adam M. Gogolak, David P.T. Webb, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Counsel for Defendants Jesse Levinson, Aicha Evans, Heidi Roizen, Daniel Cooperman, Laurie Yoler, Carl Bass, Michael Cannon-Brookes, Zu Liu Hu, Christopher Nalevanko, Zoox, Inc., and Amazon.com, Inc.*

**McCORMICK, C.**

This case arises from Amazon.com, Inc.'s 2020 acquisition of Zoox, Inc. for $1.3 billion.  Most of the merger consideration went to Zoox's noteholders and preferred stockholders.  The common stockholders received very little.

The plaintiffs owned Zoox common stock at the time of the acquisition.  They bring this class action challenging the acquisition.  Their primary grievance is that Zoox's directors and officers breached their fiduciary duties in connection with the acquisition and that Amazon aided and abetted in those breaches.  Their theory is that Zoox's board and management were motivated by conflicts of interest while negotiating the merger.  As conflicts, they allege that certain members of management retained their jobs after closing and received post-closing compensation packages, and certain directors were dual fiduciaries or lacked independence from interested parties.  They further allege that Amazon exploited those conflicts.  The plaintiffs advance two secondary claims.  They seek attorneys' fees from Zoox, Amazon, and the officer defendants on the grounds that they engaged in bad-faith litigation conduct by failing to timely produce certain key documents in a parallel appraisal action.  They also assert claims for breach of fiduciary on the ground that Zoox's information statement concerning the acquisition was materially deficient.

The defendants moved to dismiss the complaint.  Relying on *In re Cornerstone Therapeutics Inc, Stockholder Litigation*,[1] the director defendants argue that the plaintiffs must plead a non-exculpated claim against them but failed to do so.

---

[1] 115 A.3d 1173 (Del. 2015).

Amazon, the officer defendants, and Zoox argue that the plaintiffs failed to state a claim against them for other reasons.

This decision delivers a mixed outcome on the defendants' motions to dismiss. The plaintiffs have adequately alleged a non-exculpated claim against more than half of the directors who were conflicted with respect to the Amazon acquisition, and the court thus denies the *Cornerstone* motions as to the sale-process claims against the conflicted directors. But the court dismisses the sale-process claims as to the other directors, the aiding and abetting claim, and the attorneys' fees claim. That leaves the disclosure issues, on which the court requests supplemental submissions.

I. FACTUAL BACKGROUND

The facts are drawn from the Verified Amended Class Action Complaint (the "Amended Complaint") and the documents it incorporates by reference.[2]

A. Zoox Considers Financing And Sale Options.

In 2014, Defendant Jesse Levinson and non-party Tim Kentley-Klay founded Zoox (or the "Company") to design, build, and operate a fleet of self-driving "robotaxis" to provide ride-hailing services.

---

[2] C.A. No. 2023-0521-KSJM, Docket ("Dkt.") 14 ("Am. Compl."). This decision cites to the following exhibits submitted with the parties' briefing by "PX" or "DX" as follows: DX-1 through DX-50 to the Transmittal Affidavit of Benjamin M. Whitney in Connection With Defendants' Opening Brief in Support of Their Motions to Dismiss The Verified Amended Class Action Complaint (Dkts. 37–38); DX-51 through DX-53 to the Transmittal Affidavit of Benjamin M. Whitney in Connection With Defendants' Reply Brief in Support of Their Motions to Dismiss The Verified Amended Class Action Complaint (Dkt. 46); and PX-1 through PX-18 to the Transmittal Affidavit of Christopher H. Lyons in Support of Plaintiffs' Brief in Opposition to Defendants' Motions to Dismiss the Verified Amended Class Action Complaint (Dkt. 43).

As of 2020, Zoox's capital structure provided payment of the first $1.0717 billion of proceeds from any acquisition to Zoox's noteholders and preferred stockholders: $300 million to convertible noteholders; $478.5 million to Series B preferred stockholders; and $293.2 million to Series A and A-1 preferred stockholders. The Series A preferred would not receive any additional upside from deal proceeds between $1.0717 billion and about $2 billion. The Series B preferred would not receive any additional upside from deal proceeds between $778.5 million and about $2.9 billion. No preferred stockholder, therefore, had an interest in pressing for a deal price over $1.0717 billion unless that price exceeded $2 billion (for the Series A) or $2.9 billion (for the Series B).

In December 2019, Zoox engaged the investment bank Qatalyst Partners LLC to explore a financing transaction or sale of the Company. By March 2020, Zoox concluded it needed to raise at least "$150-200M, preferred $250M to maintain [the] same strategy" and operate through 2020.[3] At the time, the Company was focused on issuing another round of preferred stock as its financing option. As the COVID-19 pandemic progressed, however, interested investors began disengaging. Zoox changed gears.

**B.    The Zoox Board Forms An Independent Director Committee.**

The Zoox board of directors ("Board") convened a meeting on April 7, 2020. The Board comprised co-founder Levinson as well as Carl Bass, Michael Cannon-Brookes, Daniel Cooperman, Aicha Evans, Fred Hu, Heidi Roizen, and Laurie Yoler.

---

[3] Am. Compl. ¶ 47.

Evans and Levinson held management positions—Evans was CEO, and Levinson was CTO (the "Management Directors"). Evans held over 4 million restricted stock units ("RSUs"). Levinson held over 49 million shares of common stock.

Roizen, Cannon-Brookes, and Hu each owned, or were affiliated with entities that owned, a mix of preferred stock and other investments (the "Preferred-Stockholder Directors"). Roizen was partner at Threshold Ventures, which held 7,312,980 common shares (approximately 5.6% of Zoox's total common stock),[4] 4,189,070 Series A preferred shares, 179,146 Series B preferred shares, and $1 million in convertible notes.[5] Cannon-Brookes controlled the Grok funds, which held 9,971,682 Series B preferred shares and $100 million in convertible notes.[6] Hu was Chairman of Primavera, which, together with its affiliate Zooma, held 8,957,266 Series B preferred shares and $38 million in convertible notes.[7]

At the April 7 meeting, the Board formed an "Independent Director Committee." Roizen had proposed the idea and explained her reasoning in an April 4 email leading up to the Board meeting. She wrote: "Because we have 3 directors who I still believe qualify as independent, and because all three are likely to get zero

---

[4] *Id.* ¶ 20. The Amended Complaint does not specify what percentage of the total common stock Threshold's stake constituted, but if Levinson's 49,064,270 shares amounted to 37.33% of Zoox's total common stock (Dkt. 37 ("Defs.' Opening Br.") at 21), then Threshold's ~7.3 million shares amounts to ~5.56% of Zoox's total common stock.

[5] Am. Compl. ¶ 20.

[6] *Id.* ¶ 24.

[7] *Id.* ¶ 25.

value from their common shares, and because we want them to continue to serve [un]til the bitter end, which will consume their time and expose them to continued liability," she proposed establishing a committee and "put[ing] in place cash compensation" for its members.[8]

The Board placed on the committee the only three directors who were neither executives nor placed on the Board by preferred stockholders—Bass (as Chair), Yoler, and Cooperman.

Bass held 1.2 million Zoox RSUs, over 412,000 options, and $1 million in convertible notes. Yoler held 250,000 RSUs, over 595,000 shares of common stock, and over 54,000 options. Cooperman held 300,000 options. The Board determined to pay each committee member $20,000 per month of service on the committee.

The Board did not grant the committee any specific powers or responsibilities. The committee charter conveyed:

> such powers of the Board as the Board shall expressly delegate to the Committee from time to time, to the extent permitted by law, except that the Committee shall not have the power or authority to amend the bylaws of the Company or to approve or recommend to the stockholders any action which must be submitted to stockholders for approval under the Delaware General Corporation Law.[9]

## C.    The Financing And Acquisition Offers

The Company began receiving financing and acquisition offers in April 2020. The Company received four offers: a financing offer from Zoox's two largest preferred

---

[8] *Id.* ¶ 49.

[9] *Id.* ¶ 50.

stockholders; an acquisition offer from Cruise, General Motors's autonomous vehicle subsidiary; a financing and licensing offer from computer chipmaker NVIDIA; and an acquisition offer from Amazon. Although NVIDIA and Cruise would continue to improve their offers, the Board approved a term sheet with Amazon on May 13, 2020, and negotiated exclusively with Amazon thereafter.

### 1. The Preferred Stockholders' Offer

On April 28, 2020, Zoox's largest preferred stockholders, Grok and Primavera, emailed term sheets for debt and equity financing to the Company's management. The debt term sheet provided a $250 million loan to be repaid at a rate of 2.5 times the principal if Zoox obtained new equity financing or was acquired. The equity term sheet provided $500 to $750 million in Series C financing at a pre-money valuation of $500 million, with an initial closing of not less than $200 million by May 15. In response to the offer, Evans stated, "Thank you so much! We now have a floor."[10]

The offer was hugely dilutive. A $500 million investment valuing Zoox at $500 million pre-financing would result in the new Series C holders owning 50% of the Company, substantially diluting Zoox's current stockholders.

### 2. The Cruise Offer

On May 1, 2020, Cruise made a non-binding offer to buy Zoox for $125 million in cash and $275 million in Cruise common shares. The offer stated that "Cruise desires to retain Zoox CTO and CEO and is ready to begin discussions re: specific

---

[10] *Id*. ¶ 59.

6

roles, responsibilities, and other terms."[11] Cruise's proposal also contemplated that any Zoox employees retained after a merger would receive new compensation packages that included Cruise RSUs. Qatalyst "informed Cruise that they w[ould] need to up their offer to be in consideration."[12]

### 3. The NVIDIA Offer

On May 4, 2020, NVIDIA sent Zoox a non-binding term sheet offering to lead a Series C fundraising round with an investment of $400 million, conditioned on obtaining an additional $200 million from other investors. The offer was based on a $2 billion pre-money valuation.

NVIDIA also proposed a "[t]echnology [p]artnership" in which NVIDIA and Zoox would "cross-license their respective autonomous vehicle-related technology to each other" in perpetuity, without royalties.[13] The license to Zoox would allow it to employ NVIDIA technology only in a U.S. robotaxi service that relied only on NVIDIA hardware. The license to NVIDIA would allow NVIDIA to use, or license to others, Zoox technology for any purpose except NVIDIA's own operation of a robotaxi service in the United States. The term sheet provided for a thirty-day period of exclusive negotiations to paper a definitive agreement. The Board met the next day and authorized management to continue discussions with NVIDIA.

---

[11] *Id.* ¶ 60.

[12] *Id.* ¶ 63.

[13] DX-10 at 1108.

7

On May 6, Zoox sent NVIDIA a marked-up term sheet. The mark-up increased the pre-money valuation for the investment to $2.75 billion. It also proposed significant changes to the licensing arrangement. Under Zoox's counterproposal, the license to NVIDIA would be royalty-bearing and allow NVIDIA to use or license Zoox's technology for any purpose besides operating a robotaxi service or "providing a complete autonomous vehicle solution"—*i.e.*, a fully functional self-driving vehicle.[14]

NVIDIA rejected Zoox's mark-up less than two hours after receiving it. The license was the sticking point. NVIDIA's CEO emailed Evans and Levinson, noting that "[p]aying royalties for technologies we weren't seeking and risk contamination in any sort of collaboration is unacceptable to us."[15]

Levinson wrote back to NVIDIA quickly, affirming that Zoox was "excited and motivated to partner with NVIDIA."[16] He added that:

> [W]e're close on the rest of the terms, and since the royalty is a hard no for you (thanks for explaining your perspective), we are willing to concede that point and hopefully move forward with you.[17]

On May 7, NVIDIA's CEO offered to continue discussions. Despite Zoox's willingness to concede on royalties, he expressed skepticism that the investment would ultimately prove fruitful for NVIDIA. As he explained, "I still have a major problem that I don't know how to solve—getting the teams to really work together so

---

[14] DX-12 at 4121.

[15] DX-13 at 4245.

[16] *Id.*

[17] *Id.*

that we somehow discover value that justifies the investment. The likelihood is that after the investment, we both go back to do what we were doing before, independently."[18]

The Board harbored their own concerns about NVIDIA's terms. The Board was concerned "the exclusive licensing and co-development requirements would significantly impact the Company's ability to execute its future strategic plans and to raise capital from, or be acquired by, a third party in the future."[19]

### 4. The Amazon Offer

On May 8, 2020, Amazon sent a term sheet for a non-binding offer to acquire Zoox for $600 million in cash. Amazon also sent a proposed exclusivity agreement. Management and Qatalyst began discussing potential responses to Amazon's offer. The group discussed telling Amazon that Zoox "need[s] an acquisition price higher than $600M in order to get our Board to approve the deal."[20] And the group agreed on the importance of continuing to pursue the NVIDIA investment: "We need to keep the NVIDIA deal alive. . . . We should continue working on the commercial agreement with [NVIDIA] to maintain maximum flexibility."[21]

The Board and Qatalyst met on May 9, 2020, to discuss the potential strategic transactions. The next day, Qatalyst sent Amazon a revised term sheet that

---

[18] *Id.* at 4244.

[19] DX-28 ("Information Statement") at 8.

[20] DX-18 at 4440.

[21] *Id.* at 4441.

9

increased the purchase price to $1.3 billion less transaction costs and other expenses outstanding as of closing.

The revised term sheet also provided that Amazon would loan Zoox funds to operate until the deal closed—$30 million upon the signing of a definitive agreement, and another $30 million for each 30-day period until closing. Any amounts outstanding at closing would be deducted from the purchase price.

Evans spoke to Amazon on May 10. During the call, she told Amazon that she and Levinson were "strong advocates of a transaction with Amazon" and were "using [their] political capital with [the] [preferred investors]."[22] She said "off the record" that if Amazon was "willing to increase [its] offer to clear the preference stack, [Levinson] and [she] would be willing to use every ounce of political capital [they] have, and fall on a sword, to force the investors to take it."[23]

Amazon responded on May 12 with a revised term sheet that accepted the $1.3 billion purchase price and terms of the post-signing loan. Amazon explained that it had "met [Zoox's] ask on valuation" and a few other items and "leaned forward on all other terms as far as we can go," and so "expect[ed]" that the parties "can move to a fast execution and signing of the term sheet[.]"[24] The term sheet provided that Levinson and Evans would receive Amazon RSUs, and that the terms would be "mutually agreed upon prior to the signing of the definitive agreement."[25] Amazon

---

[22] Am. Compl. ¶ 7.

[23] *Id.*

[24] DX-21 at 4729.

[25] Am. Compl. ¶ 70.

conditioned its proposal on an exclusivity agreement that barred Zoox from negotiating a competing transaction for 45 days.

Meanwhile, the Board continued discussions on how to structure an NVIDIA investment to address concerns about the proposed licensing arrangement. Zoox came up with a counterproposal that required NVIDIA to pay royalties if it licensed Zoox technology to "[c]ore Zoox competitors developing robo-taxi technology" or to ride-hailing companies.[26] On May 12, NVIDIA increased its proposed pre-money valuation in response but declined Zoox's proposed changes to the licensing arrangement. NVIDIA offered to agree to a pre-money valuation of $2.4 billion, between the $2 billion valuation it had originally proposed and Zoox's requested valuation of $2.75 billion. But NVIDIA continued to demand the right to license Zoox technology—even to Zoox's competitors—without paying any royalties.[27]

On May 12, the Board met with Qatalyst to discuss Amazon's and NVIDIA's revised proposals. At the end of the meeting, the Board approved the terms of the Amazon proposal and Zoox's entry into the exclusivity agreement. After the meeting, Qatalyst sent Amazon a mark-up of the term sheet and exclusivity agreement. Zoox and Amazon executed the documents on May 13.

---

[26] DX-22 at 4693.

[27] *See* PX-2 at 4832 ("NVIDIA shall have an exclusive, royalty-free license, including the ability to sub-license the source code to customers, to use [Zoox] technology for any purpose other than operating NVIDIA owned commercial Robotaxi services in the United States.").

11

### 5. Cruise Increases Its Proposal After Zoox Enters Into Exclusivity With Amazon.

On May 30, Cruise submitted a revised offer for $1.05 billion—$500 million in cash and $550 million in Cruise preferred stock. Cruise noted that it was "aware of the recent press reports" that Zoox was pursuing an alternative transaction and was sending the proposal "that [it] had planned, but [was] not able, to share" on May 13, since "[Zoox] had chosen to end [transaction] discussions."[28] The Board discussed the offer that same day. Consistent with the terms of its exclusivity agreement with Amazon, Zoox did not respond to the Cruise offer.

### D. The Employee Retention Bonus Plan

Before the Company received the April and May financing and acquisition offers, in April 2020, the Board began considering incentives to retain employees post-transaction, including a "carve-out" or "transaction bonus plan" under which current employees would receive a portion of the proceeds from a sale of the Company with priority over stockholders (the "Bonus Plan").

Jon Foster, Zoox's CFO, proposed that Evans and Levinson receive collectively either 10% or 5% of over $200 million up to $1 billion, and other employees receive up to 15%. He recommended the funds for the Bonus Plan be "drawn pro rata" from the noteholders and preferred stockholders, and that "none of the funds . . . come from M&A proceeds that would otherwise go to holders of common stock."[29] Levinson

---

[28] DX-25 at 6209.

[29] Am. Compl. ¶ 52. That is a structure that this court has suggested would satisfy fiduciary view. *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 59–62 (Del. Ch. 2013) [*Trados II*].

12

described the concept of a 5% carveout for him and Evans as "not very enticing[,]" but he agreed to have Foster model such a pool.[30]

The Board considered the Bonus Plan on April 16, April 20, and April 21, 2020. Evans circulated models to the Board before the meetings proposing that up to 15% of the first $1 billion of transaction proceeds would be paid to all employees except Evans and Levinson. In her cover email, Evans noted that "[t]his plan does not include [Levinson] and me; we will address appropriate compensation for [Levinson] and me separately."[31] She explained that the plan would "apply only to the first $1B in M&A proceeds. . . . Everything above $1.1B goes to the holders of common stock."[32]

Evans also explained that the plan was subject to approval by the preferred stockholders and noteholders.[33]

On April 21, the Board approved a Bonus Plan in an amount not to exceed "15% of the first $1,000,000,000 of net acquisition proceeds otherwise available for distribution to noteholders and stockholders."[34] The Board did not obtain the preferred stockholders' or noteholders' approval. Even so, shortly after the April 21 Board meeting, management announced the Bonus Plan to Zoox employees.

After Zoox agreed to the term sheet with Amazon, the Board shifted its attention back to the Bonus Plan. The Amazon offer described the Bonus Plan

---

[30] Am. Compl. ¶ 51.

[31] *Id.* ¶ 56.

[32] *Id.*

[33] *Id.*

[34] *Id.* ¶ 57.

13

consistent with the plan approved by the Board on April 21—fully funded from the proceeds otherwise due to the preferred stockholders and noteholders.[35]

The preferred stockholders, however, never approved that approach and believed it inequitable. If the common stockholders were set to receive nothing, then of course the preferred stockholders and noteholders would fund the plan. But what if the purchase price exceeded the liquidation preferences?

On May 24, Bass emailed the Board to raise the issue that the Amazon term sheet failed to specify "exactly how the proceeds would be split if the purchase price exceeded the preferences."[36] The email attached a spreadsheet mapping out different methods for calculating the distribution of proceeds to each class of Zoox stockholders.

The spreadsheet indicated how funding the Bonus Plan would affect Zoox's largest preferred stockholders and noteholders. It reflected that Grok would receive $230 million on its $211 million investment if the preferred stockholders funded 100% of the Bonus Plan, $234 million if the common stockholders contributed pro rata, or $261 million if the common stockholders funded 100% of the plan. Primavera would receive $138.5 on its $138 million investment if the preferred stockholders fully funded the Bonus Plan, compared to $157 million if the common stockholders funded the plan.

The Independent Director Committee met on May 26. Recall that each member of the committee owned common stock, RSUs, or options. Bass also held

---

[35] *Id*. ¶ 75.

[36] *Id*. ¶ 85.

14

$1 million in convertible notes. Aside from Bass, the committee members seemed optimally suited to negotiate on behalf of the common stockholders with respect to the treatment of the Bonus Plan. During the May 26 meeting, however, the committee members determined that these holdings gave rise to "pecuniary interest[s] in the treatment of the outstanding debt and/or equity securities of the Company in connection with the" Bonus Plan.[37] The meeting minutes state that: "As a result, the members of the [Independent] Committee unanimously agreed to rename the Committee to be the 'Special Committee' of the Board."[38] The newly minted Special Committee discussed the Bonus Plan but did not reach any decisions about its funding.

### E. The Board Continues To Consider The Bonus Plan.

On May 30, the Board met for three hours to discuss the Bonus Plan. Bass proposed that preferred stockholders fund 59% of the Bonus Plan, and common stockholders contribute the remaining 41%.[39] Levinson, Evans, and Foster proposed that Zoox's noteholders fund 20% of the Bonus Plan, and common stockholders

---

[37] DX-51 at 0094. Setting aside Bass's ownership of convertible notes, this conclusion is surprising. Securities that align the directors' interests with those of the common stockholders generally reduce the potential for conflicts of interest; they do not create them. Although securities like RSUs and options can have some features that create a divergence of interest, it does not seem that the committee was focused on this nuanced issue.

[38] *Id.* It is not clear from the pleadings why the committee changed its name. The name change had no substantive effect on any conflicts of interest.

[39] According to the Amended Complaint, Bass did not allocate payment to noteholders. *See* Am. Comp. ¶ 90 ("Bass proposed that the carve-out be paid for 59% by preferred stockholders and 41% by common stockholders.").

contribute the remaining 80%. The Board adjourned the meeting without resolving how to fund the Bonus Plan. The next morning, Bass stated that he was "not optimistic that there's a willingness for people to compromise" on the issue and conveyed his concern that "people's intransigence might prove catastrophic."[40]

On June 2, Evans and Levinson raised two new proposals: either have the noteholders and preferred stockholders fund the Bonus Plan and have the common stockholders absorb the cost of the Amazon bridge loan and indemnification obligation, or have Amazon fully fund the Bonus Plan.

The Board met on June 4 to discuss the Bonus Plan again. They again ended their meeting without reaching a resolution.

To move the deal forward, Amazon proposed that it fund 30% of the Bonus Plan, common stockholders fund 25%, and preferred stockholders fund the remaining 45%. On June 16, the Board approved Amazon's proposal and instructed management to proceed with finalizing the terms of the deal.

The Board also approved a cash bonus for Evans of $5.4 million minus the sale proceeds that she would receive from her Zoox equity. She ultimately received a cash bonus of around $3.4 million. The Board did not approve a comparable bonus for Levinson.

On June 24, the Board approved the merger agreement, and the parties executed it the next day (the "Merger Agreement").

---

[40] *Id.* ¶ 91.

## F. The Transaction Closes.

Zoox distributed an Information Statement regarding the Merger Agreement to its stockholders on July 6, 2020. The Information Statement explained that under Zoox's charter and bylaws and Delaware law, the Merger Agreement required approval from a majority of the voting power of outstanding stock and a majority of the voting power of the common stock and of the preferred stock, voting as two classes. The Information Statement disclosed that Zoox had obtained the requisite stockholder approvals by written consent on June 25, but the Merger Agreement obligated Zoox to seek each stockholder's consent to and joinder in the Merger Agreement. The statement thus requested that each stockholder execute consent and joinder forms. The transaction closed on August 10, 2020 (the "Merger").

## G. Post-Closing Statements

After the Merger closed in 2020, Levinson and Evans made statements suggesting that they were not looking for the best deal for the common stockholders during the sale process, but to continue their work with Zoox post-closing.

During a 2021 interview, Levinson said:

> [W]e knew we were on a unique and important mission. And we had a feeling that most big companies maybe wouldn't appreciate that. Or they would be like, "Well, here's some technology. We can use it for this other thing." And that might kind of be a bit of a waste. Not a complete waste, but not really living up to that full dream that we had when we started the company in 2014. . . .
>
> [Amazon is] looking for those rare opportunities where you can create multi-hundred billion dollar businesses, and this is one of them. And they loved our approach, they loved the vehicle, they loved the way we were tackling this problem. And so to get to be a fully independent subsidiary

17

of Amazon and continue to work on our full and unbridled mission with the resources and support of Amazon, was kind of a dream come true[.][41]

During a 2022 interview, Evans stated that she and Levinson "weren't looking for the biggest valuation. This was not about what's the best exit you can get and then moving on to the next thing. . . . This is not a job. . . . This is a mission."[42]

## H.    Plaintiffs Obtain Documents.

Plaintiffs James Wei and Yanxin Zhang ("Plaintiffs") owned Zoox common stock. A few days before the Merger closed, Plaintiffs sent inspection demands to Zoox under Section 220 of the DGCL requesting information about the Merger.[43] During the five-day period Zoox had under Section 220 to respond to the demand, the Merger closed.[44] Zoox responded to Plaintiffs after the closing, informing them that, by operation of the Merger, Plaintiffs had lost standing to enforce their inspection demands.[45] Plaintiffs sued Zoox under Section 220.[46]

After Zoox moved to dismiss the Section 220 action, Plaintiffs voluntarily dismissed the suit and filed an appraisal action.[47] In the appraisal action, the court

---

[41] *Id.* ¶ 114.

[42] *Id.* ¶ 68.

[43] *See Wei v. Zoox, Inc.*, 268 A.3d 1207 (Del. Ch. 2022).

[44] *Id.* at 1211.

[45] *Id.*

[46] *Id.*

[47] *See Wei v. Zoox, Inc.*, C.A. No. 2020-1036-KSJM, Dkt. 1.

18

limited the scope of discovery to "no more information . . . than what [Plaintiffs] would be entitled to through a Section 220 proceeding."[48]

Zoox produced to Plaintiffs all formal Board materials from April 1, 2018, through the closing of the Merger, concerning: the Amazon sale and any alternative transaction; Zoox's financial performance; any plans or projections of Zoox; the value of Zoox's common stock, preferred stock, or other securities; Zoox's uses of capital; and any indications of interest and term sheets for the Amazon transaction and any alternative deal (the "Appraisal Documents").[49]  By agreement of the parties, all documents produced by Zoox are incorporated by reference into the Amended Complaint.[50]

## I.    This Litigation

On May 11, 2023, Plaintiffs filed this suit on behalf of themselves and all other former common stockholders of Zoox.[51]  Plaintiffs filed the Amended Complaint on January 29, 2024.[52]  The Amended Complaint contains four Counts:

---

[48] *Zoox*, 268 A.3d at 1223.

[49] *See* DX-29 at 1–2 (ESI Discovery Proposal, *Wei v. Zoox*, C.A. No. 2020-1036-KSJM).

[50] *Id*.  Although the parties agree the Appraisal Documents are incorporated by reference into the Amended Complaint, this agreement does not enable the court to weigh evidence.  When a document leads to competing factual conclusions or interpretations, the court draws inferences in Plaintiffs' favor. *See In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at \*14 (Del. Ch. June 11, 2020) ("The doctrine of incorporation by reference does not enable a court to weigh evidence on a motion to dismiss, nor does it mean that the defendants receive inferences in their favor that run contrary to the allegations of the complaint.").

[51] C.A. No. 2023-0521, Dkt. 1.

[52] Dkt. 14.

- In Count I, Plaintiffs assert claims for breaches of fiduciary duty against Levinson, Evans, Roizen, Cooperman, Yoler, Bass, Cannon-Brookes, and Hu (collectively, the "Director Defendants").

- In Count II, Plaintiffs assert claims for breaches of fiduciary duty against Levinson, Evans, and Zoox's General Counsel, Christopher Nalevanko (collectively, the "Officer Defendants").

- In Count III, Plaintiffs assert a claim against Amazon for aiding and abetting breaches of fiduciary duty.

- In Count IV, Plaintiffs seek fee-shifting for bad-faith litigation conduct against Zoox, Amazon, and the Officer Defendants in connection with the appraisal action.

As relief, Plaintiffs seek compensatory damages, rescissory damages, pre- and post-judgment interest, disgorgement of profits from the Merger, legal fees in connection with their appraisal action, and attorneys' fees and costs.

Defendants moved to dismiss the Amended Complaint.[53] The parties completed briefing on the motions on September 10, 2024, and the court heard oral argument on October 17, 2024.[54]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[55] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true, . . . draw all

---

[53] Dkts. 24–26.

[54] *See* Dkt. 62.

[55] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

20

reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[56] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[57]

## A. Count I Against The Director Defendants

In Count I, Plaintiffs assert claims for breaches of fiduciary duty in connection with the sale process. They also challenge the disclosures made in the Information Statement as a basis for breach of fiduciary duty.[58] This portion of the analysis addresses the sale-process claims and reserves the disclosure issues for supplemental briefing.

The parties dispute the standard of review applicable to the sale-process claims. Plaintiffs argue that entire fairness applies because at least four of the eight Zoox directors were conflicted as to the Merger. In the alternative, Plaintiffs argue that the transaction is subject to enhanced scrutiny under *Revlon*.[59]

Defendants do not argue that the Independent Director Committee/Special Committee restored the business judgment rule.[60] Nor do they admit that enhanced

---

[56] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[57] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[58] Am. Comp. ¶¶ 177–178 (sale process), ¶ 179 (disclosure).

[59] Dkt. 43 ("Pls.' Opposition Br.") at 38–40 (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986)).

[60] *But see Trados II*, 73 A.3d at 65 n.39 ("The decision not to form a special committee had significant implications for this litigation. The [m]erger was not a transaction

21

scrutiny applies under *Revlon* absent a basis to invoke entire fairness, although it does.[61] And Defendants do not appear to invoke *Corwin* as a defense if *Revlon* applies, perhaps because the common stockholder approval had no effect on the approvals for the transaction, which had already been secured. Defendants skip those issues altogether and argue that Plaintiffs have failed to allege a non-exculpated claim against any Director Defendant as required by *Cornerstone*.[62]

Plaintiffs' arguments for invoking entire fairness and Defendants' arguments under *Cornerstone* effectively center on the same inquiry about each Director Defendant—whether Plaintiffs allege facts that call into question whether the Director Defendant was disinterested, independent, or acted in good faith with respect to the Merger.[63] If Plaintiffs have done so as to at least four of the Director

---

where a controller stood on both sides, and the plaintiff did not challenge [director defendant] Laidig's independence or disinterestedness. If a duly empowered and properly advised committee had approved the [m]erger, it could well have resulted in business judgment deference.").

[61] *See Revlon*, 506 A.2d 173; *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 382 (Del. 2024), *rev'g in part on other grounds*, *In re Mindbody, Inc., Stockholder Litig.*, 2023 WL 2518149 (Del. Ch. Mar. 15, 2023) ("When a stockholder challenges a change-of-control transaction, such as the all-cash merger at issue in this case, enhanced scrutiny under *Revlon* is the presumptive standard of review.").

[62] 115 A.3d 1173.

[63] *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *37 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 24, 2017) ("To state a claim against each individual director, the [c]omplaint must 'plead[ ] facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interest, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith.'" (quoting *Cornerstone*, 115 A.3d at 1179–80)); *id.* at *26 ("At the pleading stage, to change the standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that there were not enough sufficiently informed,

Defendants, then entire fairness applies.[64] If Plaintiffs have done so as to fewer than four, then *Revlon* applies.[65] Because Defendants seek dismissal under *Cornerstone* only and have not argued that the sale process fell within a range of reasonableness, the case would continue as to any defendants not entitled to exculpation under *Cornerstone*. If Plaintiffs have not adequately alleged facts to compromise any Director Defendant, then all the Director Defendants are dismissed.

To plead that a director was interested in a transaction, a plaintiff can allege facts supporting the inference that the director received "a personal financial benefit from [the] transaction that is not shared equally by the stockholders."[66] "The benefit received by the director and not shared with stockholders must be of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest."[67]

---

disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority.").

[64] *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *15 (Del. Ch. May 13, 2022) ("Where a board is evenly numbered, then a plaintiff only needs to show conflicts as to half of the board to invoke entire fairness.").

[65] *See Revlon*, 506 A.2d 173.

[66] *Maffei v. Palkon*, --- A.3d ----, 2025 WL 384054, at *18 (Del. Feb. 4, 2025) (quoting *ODN Hldg. Corp.*, 2017 WL 1437308, at *30) (internal quotation marks omitted); *see also Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) ("A transaction is interested where directors appear on both sides of a transaction or expect to derive a financial benefit from it that does not devolve upon the corporation or all stockholders generally." (cleaned up)).

[67] *Maffei*, 2025 WL 384054, at *18 (quoting *ODN Hldg. Corp.*, 2017 WL 1437308, at *30) (cleaned up).

To plead that a director lacked independence, a plaintiff can allege facts supporting the inference that a director is "so beholden to an interested director that his or her discretion would be sterilized."[68] "The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences."[69]

To plead bad faith, a plaintiff can allege facts supporting the inference that a director's conduct was motivated "by an actual intent to do harm, or when there is an intentional dereliction of duty, [or] a conscious disregard for one's responsibilities."[70] "It may also be reasonable to infer subjective bad faith in less egregious transactions when a plaintiff alleges objective facts indicating that a transaction was not in the best interests of the [company] and that the directors knew of those facts."[71] A plaintiff can plead bad faith alternatively by alleging facts supporting an inference that the defendant acted for reasons other than the best interests of the corporation.

---

[68] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1060 (Del. 2021) (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004)) (cleaned up).

[69] *Id.* (quoting *Beam*, 845 A.2d 1040 at 1049); *see also Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) ("At the pleading stage, a lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'" (quoting *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 n.25 (Del. 2015))).

[70] *McElrath v. Kalanick*, 224 A.3d 982, 991 (Del. 2020) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64, 66 (Del. 2006)) (internal quotation marks omitted).

[71] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 107 (Del. 2013).

24

"It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[72] Bad faith can be motivated by "any human emotion [that] may cause a director to place his own interests, preferences or appetites before the welfare of the corporation," including "[g]reed . . . hatred, lust, envy, revenge, . . . shame or pride."[73]

### 1. The Preferred-Stockholder Directors

Plaintiffs argue that dual-fiduciary status conflicted Zoox's three Preferred-Stockholder Directors—Roizin, Cannon-Brookes, and Hu.[74]

In *Weinberger*, the Delaware Supreme Court held that "[t]here is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."[75] If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict of interest.[76] But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest.[77]

---

[72] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 754 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[73] *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (internal citations omitted).

[74] *See supra* Part I.B (describing the respective interests of each Preferred-Stockholder Director and their affiliated entities).

[75] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[76] *See, e.g., Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991) (finding a controller-dominated board was not conflicted with respect to the sale of a company where the controller was not under distress or motivated to sell its "prime asset" for less than a fair price).

[77] *See Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) ("[T]hree of the FSC directors . . . were interested in the MEC transaction because they served on the boards . . . of both MOXY and FSC."); *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders an uncompromising duty of loyalty. There is no dilution of that

25

As this court's decisions in the *Trados* litigation illustrate,[78] preferred stockholders' interests inferably diverge from the interests of the common stockholders in commonly recurring sale-process scenarios.

In *Trados*, a former common stockholder of Trados Incorporated challenged SDL, plc's acquisition of Trados for $60 million. Of the merger consideration, Trados's preferred stockholders received approximately $52 million. Trados's executive officers received the remainder pursuant to a board-approved bonus plan. Trados's common stockholders received nothing. The plaintiff alleged that a majority of the directors on the Trados board were conflicted with respect to the merger by their affiliations with Trados's preferred stockholders.

---

obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (footnote omitted) (internal quotation marks omitted)); *Rabkin v. Philip A. Hunt Corp.*, 498 A.2d 1099, 1106 (Del. 1985) (holding that a parent corporation's directors on a subsidiary board faced a conflict of interest); *Weinberger*, 457 A.2d at 710 (holding that officers of a parent corporation faced a conflict of interest when acting as subsidiary directors regarding a transaction with the parent); *see also Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (explaining for purposes of demand futility that "'[d]irectorial interest exists whenever divided loyalties are present'") (quoting *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984))); *Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, are both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the . . . [l]oan."); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) (similar).

[78] *See In re Trados Inc. S'holder Litig.*, 2009 WL 2225958 (Del. Ch. July 24, 2009) [*Trados I*] (denying motion to dismiss as to fiduciary duty claims); *Trados II* (entering post-trial judgment for defendants where defendants had met their burden of proving that the transaction was entirely fair).

In moving to dismiss, the defendants argued that the preferred stockholders' interests were aligned with that of the common holders because they did not receive their full liquidation preference and thus had every incentive to press for a higher deal price. Former Chancellor Chandler rejected that argument, observing that the preferred stockholders received $52 million but the "common stockholders received nothing . . . and lost the ability to ever receive anything of value in the future for their ownership interest in Trados."[79] The court further concluded that it was reasonably conceivable that a majority of the directors lacked independence from the venture capital funds that held preferred stock because of their positions at the funds. This was sufficient to give rise to the inference that the plaintiff's claims would be subject to the entire fairness standard.

The case was reassigned to Vice Chancellor Laster after Chancellor Chandler's retirement, and the Vice Chancellor entered post-trial judgment for the defendants. In the post-trial decision, the Vice Chancellor elaborated on Chancellor Chandler's discussion concerning the conflicts that arise between preferred and common stockholders during a sale process. He observed that the standard features of preferred stock create economic incentives that depart from those of the common stockholders. "Because of the preferred stockholders' liquidation preferences, they sometimes gain less for increases in firm value than they lose from decreases in firm value," which can cause directors affiliated with preferred stockholders to "choose lower-risk, lower-value investment strategies over higher-risk, higher-value

---

[79] *Trados I*, 2009 WL 2225958, at *7.

investment strategies."[80]  These cash-flow rights can affect decisions on whether to sell, dissolve, or persist as an independent company.

The Vice Chancellor also explained that the "distorting effects" of preferred stockholders' economic interests "'are most likely to arise when . . . the firm is neither a complete failure nor a stunning success.'"[81]  "When the venture is a stunning success (everybody wins) or a complete failure (everybody loses), the outcomes are 'cut and dried.'"[82]  It is the "intermediate cases" that give rise to conflicts—where preferred stockholders get all or most of their payout and common stockholders lose most or all of their investment, as well as option value.[83]

The Amended Complaint depicts a classic intermediate case.  The liquidation preferences and the Bonus Plan ate up most of the Merger consideration.  There was a dead zone above around $1.07 billion where no preferred stockholder received additional consideration unless the deal price exceeded $2 billion, but the common stockholders could more than quadruple their per-share price at a deal price in that range.  Within that zone, the Preferred-Stockholder Directors were not motivated to risk the bird in hand by pressing for the added consideration or rejecting a price that was not optimal to the common stockholders.  This was not an everybody-wins or

---

[80] *Trados II*, 73 A.3d at 49 (quoting Jesse M. Fried & Mira Ganor, *Agency Costs of Venture Capitalist Control in Startups*, 81 N.Y.U. L. Rev. 967, 994 (2006) [*Agency Costs*]) (internal quotation marks omitted).

[81] *Id.* (quoting *Agency Costs* at 996).

[82] *Id.* (quoting William W. Bratton, *Venture Capital on the Downside: Preferred Stock and Corporate Control*, 100 Mich. L. Rev. 891, 896 (2002)).

[83] *Id.* at 49–50.

everybody-loses scenario. For the most part, this was a win for the noteholders, preferred stockholders, and certain management members only.[84]

Atop the typical distortive effects that the economic rights of preferred stockholders offer in the intermediate case, the Bonus Plan supplied an additional conflict. At first, the Board contemplated that the preferred stockholders and noteholders would absorb the full cost of the Bonus Plan for the first $1 billion of consideration. But the preferred stockholders and noteholders never approved that deal and ultimately sought to re-trade, placing the preferred and common stockholders at odds on the question of allocation.[85] In the end, the Board approved a deal that imposed 25% of the costs of the Bonus Plan on the common stockholders.

Nor is there any distance between the Preferred-Stockholder Directors and the preferred stockholders. This is not a situation where the preferred stockholders merely appointed otherwise independent directors to the Board. Roizen was partner at Threshold Ventures;[86] Cannon-Brookes controlled the Grok funds;[87] and Hu was

---

[84] Defendants challenge the notion that the preferred stockholders were "indifferent to increases in the $1.3 billion acquisition price." Defs.' Opening Br. at 29. They argue the deal price in fact failed to cover the entire liquidation preference, given the Bonus Plan, and the preferred stockholders therefore had every incentive to press for additional consideration. *Id.* But this lack of indifference only applied up to a certain amount of consideration; it does not align the preferred stockholders' interests with those of the common.

[85] *Cf. In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) (recognizing a conflict between a controlling stockholder and minority stockholders where the controller was "in a sense 'competing' [with the minority stockholders] for portions of the consideration [the acquirer] was willing to pay").

[86] Am. Compl. ¶ 20.

[87] *Id.* ¶ 24.

29

Chairman of Primavera.[88] The Preferred-Stockholder Directors were prototypical dual fiduciaries.

Defendants do not dispute that the Preferred-Stockholder Directors lacked independence from their affiliated preferred stockholders. Defendants instead advance a counternarrative based on the Appraisal Documents and aspects of Plaintiffs' allegations that portray an acquisition as the only option available to Zoox and the Amazon deal as the best possible acquisition.

According to Defendants, the Board received gloomy news in September 2019—that the Company was not meeting target timing for its commercial launch, was forced to reassess its go-to-market plan, and was running out of cash.[89] "If a preferred stockholder was looking to recoup its investment and move on, rather than persevere through greater risk in the hope of a better return, that is precisely the sort of gloomy news that would cause it to start advocating for a sale."[90] Yet the Board continued to explore Series C financing options, which Defendants portray as the Board's "first objective."[91] Defendants argue that the Preferred-Stockholder Directors joined in this objective, which Defendants say cannot be squared with the idea that they were more interested in pursuing a payout than a non-sale alternative.

---

[88] *Id.* ¶ 25.

[89] Defs.' Opening Br. at 27 (citing DX-2 at 2003).

[90] *Id.*

[91] *Id.*

30

Defendants also point to multiple allegations that cast doubt on whether the Board could have achieved a better alternative for the common stockholders.[92]

Perhaps Defendants will prove their narrative at trial. But it rests on defendant-friendly inferences, which the court cannot draw at the pleading stage.[93] Plus, Defendants' narrative ignores some of the nuance in Plaintiffs' theory. Regardless of whether the preferred stockholders' "first objective" was to pursue a non-sale option, their interests diverged from the common stockholders' once the

---

[92] *See* Dkt. 66 (10/17/24 Oral Arg. Tr.) at 13:14–14:3 (arguing that the Company's history of issuing debt instead of "pivot[ing] to an M&A option . . . negates . . . an inference that management preferred a sale to continued independent operation"); *id.* at 14:4–15 (arguing that an email from Evans that listed finding an acquiror as "Plan B" "negate[d] rather than support[ed] an inference that management preferred a sale to continued independence"); *id.* at 15:20–16:2 (arguing that NVIDIA's financing offer was "nowhere near enough to get Zoox to market" and that "once NVIDIA essentially owned the right to deploy the technology royalty free, no one else was going to come into this endeavor"); Defs.' Opening Br. at 25 (noting that Cruise's $1.05 billion was "too little to leave Zoox common stockholders with any payout at all from the acquisition consideration").

[93] *See Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009) ("On a motion to dismiss, the Court of Chancery [is] not free to disregard [a] reasonable inference, or to discount it by weighing it against other, perhaps contrary, inferences that might also be drawn."); *In re Fox Corp. Deriv. Litig.*, 2024 WL 5233229, at *7 (Del. Ch. Dec. 27, 2024) ("[I]f the pleading supports competing inferences, both of which are reasonable, then the court must adopt the plaintiff-friendly inference. The court cannot draw a defense-friendly inference at the pleading stage, even if that inference seems relatively stronger than a competing (and reasonable) plaintiff-friendly inference."); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 799 (Del. Ch. 2022) ("The Rule 12(b)(6) pleading standard necessarily informs my analysis of the plaintiffs' claims. Many of the defendants' arguments would require the court to weigh evidence or draw inferences in the defendants' favor. But [the court] can do neither on a motion to dismiss."); *Stempien v. Marnie Props., LLC*, 2017 WL 6016568, at *3 (Del. Ch. Nov. 3, 2017) ("To draw . . . inferences in [d]efendant's favor would be improper at the motion to dismiss stage."); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *7 (Del. Ch. Feb. 21, 2014) (noting that in deciding a motion to dismiss "[r]easonable inferences favoring the [p]laintiff cannot be disregarded in favor of contrary inferences favoring the [d]efendants").

31

Company determined to pursue a sale. At that point, the preferred stockholders had no incentive to press for a better deal within the dead zone above the liquidation preferences and had every incentive to agree to the bird in hand rather than press for a better deal for the common stockholders.

In sum, Plaintiffs have adequately alleged that the Preferred-Stockholder Directors lacked independence from the preferred stockholders, whose interests in the Merger conflicted with those of the common stockholders.[94]

### 2. The Management Directors

Plaintiffs argue that Evans and Levinson were conflicted with respect to the Merger because they received personal financial benefits from the transaction that were not equally shared with other stockholders. Plaintiffs also argue that both Evans and Levinson were more interested in furthering Zoox's mission than maximizing stockholder value.

"A director is interested in a transaction if 'he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders[.]'"[95] A personal interest can also give rise to a conflict at the pleading stage where it is reasonably conceivable that the director placed those interests ahead

---

[94] Defendants argue that none of Plaintiffs' theories work as to Roizin, whose fund owned over seven million shares of Zoox common stock. *See* Defs.' Opening Br. at 29–30. But the blended nature of Roizen's investment meant that her fund experienced a 5% increase in sale proceeds for any 25% increase to the common. Am. Compl. ¶ 110. Based on the composition of Roizen's investment, it is reasonably conceivable that her interests did not align with those of the common stockholders.

[95] *Trados I*, 2009 WL 2225958, at *6 (quoting *Rales*, 634 A.2d at 936).

of maximizing common-stockholder value.[96] A conflicting interest can include "the achievement of a personal dream" or "desire to prove [one]self as an entrepreneur[.]"[97] The personal financial benefit or interests "must be of a sufficiently material importance . . . as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interests[.]"[98]

As non-ratable benefits, Plaintiffs point to a variety of factors. Evans was promised $3.4 million in an executive bonus, negotiated for Amazon RSUs worth $8 million and Zoox stock appreciation rights equivalent to 1.5% of Zoox's fully diluted share capital, and had every expectation of remaining CEO at Zoox post-closing. Levinson had significant amounts of common stock but was also promised $5 million in Amazon RSUs and Zoox stock appreciation rights equivalent to 1.5% of Zoox's fully diluted share capital. He also had every expectation of continuing as Zoox's CTO post-closing. These are benefits that the common stockholders did not receive. It is reasonably conceivable that these personal financial benefits were material to Evans

---

[96] *See Trados II*, 73 A.3d at 64 (identifying a co-founder's "personal interests" in "favor[ing] the transaction in part because it would preserve Trados's technology, which he had developed and worked on for years"); *RJR Nabisco,* 1989 WL 7036, at *15 ("Greed is not the only human emotion that can pull one form the path of propriety; so might hatred, lust, envy, revenge, or . . . shame or pride.").

[97] *Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *1 (Del. Ch. June 3, 2008).

[98] *Trados I*, 2009 WL 2225958, at *6 (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)) (internal quotation marks omitted).

and Levinson, whose annual salaries at the Company were $800,000 and $300,000, respectively.[99]  This alone renders Evans and Levinson conflicted.[100]

Plaintiffs' mission-driven conflicts theory finds support in Evans's and Levinson's own statements.  In her May 10 call with Amazon, Evans told the bidder that:

- "Jesse and I are very excited about the potential of being a part of Amazon because we think that you . . . [will] enable us, together, to achieve the dream that we have for Zoox."[101]

- "I want to tell you off the record that if you were willing to increase your offer to clear the preference stack, Jesse and I would be willing to use

[99] *See* Am. Compl. ¶¶ 111, 113.

[100] *See Goldstein v. Denner*, 2022 WL 1671006, at *53 (Del. Ch. May 26, 2022) (finding it reasonably conceivable a CFO was interested in a transaction where the plaintiff alleged he received unique financial benefits that  were "nearly four times [his] annual compensation"); *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *13 (Del. Ch. Oct. 11, 2019) (inferring interestedness even though the "[p]laintiffs ha[d] not directly alleged materiality" because "at the pleading stage, they are entitled to the inference that a [unique transaction benefit] equivalent to two years of an officer's salary would be sufficiently material"); *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 n.3 (Del. Ch. Jan. 8, 2002) (noting that "the remuneration a person receives from her full-time job is typically of great consequence to her").  Defendants argue that the promise of post-closing employment can only support a conflict if the officer "needed an acquisition to hang onto their jobs" or if the "acquisition promised materially better employment."  Defs.' Opening Br. at 23–24 (citing first *Wayne Cnty. Empls.' Ret. Sys. v. Corti*, 2009 WL 2219260 (Del. Ch. July 24, 2009); then *City of Miami Gen. Empls.' and Sanitation Empls.' Ret. Tr. v. Comstock*, 2016 WL 4464156 (Del. Ch. Aug. 24, 2016); and then *City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896 (Del. Ch. Nov. 30, 2020)).  If that is an accurate statement of the law, it is reasonable to infer that, as Defendants argue, the "Board received gloomy news in September 2019—that the Company was not meeting target timing for its commercial launch and was forced to reassess their go-to-market plan, and was running out of cash" (*id.* at 27 (citing DX-2 at 2003)), such that an acquisition was the most viable way for the Management Directors to hang onto their jobs and continue their mission with Zoox.  This is not the only inference, but it is a reasonable one.

[101] Am. Compl. ¶ 7.

every ounce of political capital we have, and fall on a sword, to force the investors to take it."[102]

- "Remember, you were not even in the game and I gave you a heads up because Jesse and I would really like to figure out a way to do a deal with Amazon. You will have to trust me."[103]

- Evans and Levinson were "advocates of a transaction with Amazon" and were working "to figure out . . . the lowest common denominator that could get a deal done."[104]

These statements align with what Evans and Levinson said after closing. During a 2021 interview, Levinson said that "[w]e knew we were on a unique and important mission," and that "most big companies maybe wouldn't appreciate that."[105] But Amazon was different because it was "looking for those rare opportunities where you can create multi-hundred billion dollar businesses, and this is one of them. And they loved our approach, they loved the vehicle, they loved the way we were tackling this problem."[106] Levinson believed that to "be a fully independent subsidiary of Amazon and continue to work on our full and unbridled mission with the resources and support of Amazon, was kind of a dream come true."[107] During a 2022 interview, Evans stated that she and Levinson "weren't looking for the

---

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] Am. Compl. ¶ 114.

[106] *Id.*

[107] *Id.*

biggest valuation. This was not about what's the best exit you can get and then moving on to the next thing. . . . This is not a job. . . . This is a mission."[108]

These statements resemble post-merger statements made by the CEO in *Mindbody*.[109] There, the court held that the plaintiffs had adequately alleged that the CEO's personal interests—there, a "subjective desire for near-term liquidity and the opportunity to continue as CEO of the post-[m]erger entity"[110]—rendered him conflicted. One of the factual allegations supporting this inference was a post-transaction interview done by the CEO, during which he discussed the fact that "98% of [his] net worth" was "locked inside the business[,]" which was problematic as he was "in [his] 50s" with "kids in college."[111]

To be clear, some of the post-Merger comments from Evans and Levinson are slightly less damning than the statements in *Mindbody*. For example, the link between a desire to continue a company's mission and the desire to sell that company is more attenuated than the link between a desire for liquidity and a desire to sell.

Still, it is reasonable to infer that Evans and Levinson meant what they said. They weren't "looking for the biggest valuation" or working in good faith to maximize common stockholder value.[112] Rather, they were "advocates of a transaction with Amazon" because it offered them a unique path "to achieve the dream that [they]

---

[108] *Id.* ¶ 68.

[109] 2020 WL 5870084 (Del. Ch. Oct. 2, 2020).

[110] *Id.* at *15.

[111] *Id.* at *3.

[112] Am. Compl. ¶ 68.

36

ha[d] for Zoox."[113] The Amazon deal was "a dream come true."[114] Thus, once Amazon offered a deal price that cleared the "preference stack," Evans and Levinson were using "every ounce of political capital" they had to get the deal done.[115]

Plaintiffs also allege that Evans and Levinson favored a deal with Amazon over Cruise and NVIDIA, advancing different theories for why they disfavored the other bidders.

As to Cruise, they allege that a deal with Amazon was more appealing to Evans and Levinson because they could retain their roles of CEO and CTO, with the freedom to run Zoox as an independent subsidiary of Amazon. By contrast, a Cruise acquisition would merge Zoox into General Motors's existing autonomous vehicle subsidiary, which already had its own CEO and CTO. This is a reasonable inference. Defendants say that, to state a claim, Plaintiffs must plead that the Cruise acquisition could have provided greater value than the Amazon acquisition for Zoox

---

[113] *Id.* ¶ 7.

[114] *Id.* ¶ 4.

[115] *Id.* ¶ 7. Defendants seek countervailing inferences with respect to these statements. Defendants argue that if continuing their "mission" with Zoox was Evans's and Levinson's "goal, then Zoox's continued independence offered them the greatest chance to achieve it." Defs.' Opening Br. at 22. But Defendants' position that Evans and Levinson had "professional and financial desires best served by Zoox's continued operation as an independent company" is a defense-friendly inference the court cannot draw at this procedural stage. *Id.* As to the talking points for Evans's call with Amazon, Defendants write them off as an example of "an executive stroking a bidder to encourage it to raise its offer." *Id.* at 38. But that is another contrary, defense-friendly inference the court cannot make at this time. Again, on a motion to dismiss, the court must draw all reasonable inferences in a plaintiff's favor. Doing so here requires crediting Evans's and Levinson's plain statements, which, taken at face value, support Plaintiffs' position that Evans and Levinson were motivated by interests that were misaligned with common stockholders' best interests.

37

common stockholders. But they cite to no case for that proposition. To assess the standards of review at the pleading stage, it is sufficient to allege the existence of a conflict.

As to NVIDIA, Plaintiffs fault Evans and Levinson for asking NVIDIA to raise its valuation of Zoox from $2 billion to $2.75 billion, arguing that the request shows they were trying to scuttle a deal with NVIDIA in favor of a sale to Amazon. This is a stretch based on the timing of the discussion, given that Evans and Levinson asked NVIDIA to raise its valuation days before Zoox received any acquisition offer from Amazon. But it is nevertheless reasonably conceivable. They also contend that Zoox's request to NVIDIA to raise its valuation by 20% does not reflect favoritism in light of the Company's ask that Amazon more than double its initial bid. But even if Plaintiffs fail to plead facts suggesting that Evans and Levinson acted to disadvantage NVIDIA to Amazon's benefit during negotiations, that failure does not neutralize Plaintiffs' other well-pled allegations about the conflicts of interest.

Plaintiffs have adequately alleged that both Evans and Levinson harbored conflicts with respect to the Merger.

### 3. The Remaining Directors

Plaintiffs argue that the remaining directors, those on the Special Committee—Cooperman, Yoler, and Bass—too were conflicted. Bass held $1 million in convertible notes, and thus, his interest diverged from the common stockholders' interests with respect to funding the Bonus Plan.[116] But Plaintiffs do not claim that

---

[116] *See supra* Part II.A.1.

Cooperman or Yoler held conflicting financial interests. Instead, they argue that Cooperman and Yoler lacked independence from other conflicted directors, and that as a result, they acted in bad faith by promoting "the interests of management and the VC firms ahead of maximizing common stockholder value."[117] Plaintiffs do not allege any facts to support this allegation. Arguing no other bases of conflict, Plaintiffs do not plead facts sufficient to infer Cooperman and Yoler were conflicted as to the Merger.

### 4. Conclusion Regarding Count I

Plaintiffs have adequately alleged that at least half of the Board was conflicted as to the Merger. It is reasonably conceivable, therefore, that the entire fairness standard will apply. At this stage in the proceedings, that requires Plaintiffs to plead the Merger was not the product of both fair dealing and fair price.[118]

"The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[119] It turns on "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[120] The element of "fair price" "relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets,

---

[117] Pls.' Opposition Br. at 30.

[118] *See Weinberger*, 457 A.2d at 711 ("The concept of fairness has two basic aspects: fair dealing and fair price.").

[119] *Kahn v. Tremont Corp.*, 694 A.2d 422, 430 (Del. 1997).

[120] *Weinberger*, 457 A.2d at 711.

market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a" company.[121] This "is often the paramount consideration" in an entire fairness analysis "because a fair price is more likely to follow fair dealing."[122]

Given that Plaintiffs have sufficiently alleged that the Management Directors, Preferred-Stockholder Directors, and Bass were conflicted and involved in the sale process, the Amended Complaint makes an inference of unfair dealing reasonably conceivable.[123] Plaintiffs also adequately plead that the Merger was consummated at an unfair price to common stockholders because it is reasonably conceivable that the conflicted fiduciaries did not attempt to negotiate a deal price beyond what would satisfy the liquidation preferences. It is also reasonably conceivable that the Preferred-Stockholder Directors and noteholder Bass promoted their own interests ahead of the common stockholders' interests when negotiating the funding of the Bonus Plan. Plaintiffs have adequately alleged that the Merger was not entirely fair.

Plaintiffs have failed to plead Yoler or Cooperman were conflicted. The sale-process claims against Yoler and Cooperman therefore only support an inference that

---

[121] *Id.*

[122] *Monroe Cnty. Empls.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010)

[123] *See RCS Cred. Tr. v. Schorsch*, 2017 WL 5904716, at *10 n.159 (Del. Ch. Nov. 30, 2017) ("It is reasonably conceivable that the transactions on which the core claim is premised were not the product of fair dealing, since they were engineered and approved by conflicted fiduciaries."); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1173 (Del. 1995) ("The independence of the bargaining parties is a well-recognized touchstone of fair dealing." (citations omitted)).

they breached their duty of care. They are entitled to exculpation under *Cornerstone*, and the sale-process claims are dismissed as to them.

## B. Count II Against The Officer Defendants

In Count II, Plaintiffs assert claims for breach of the duties of loyalty and care against Evans, Levinson, and Nalevanko in their capacities as CEO, CTO, and General Counsel. If a defendant is a director and officer not protected by an exculpatory charter provision, "only those actions taken solely in the defendant's capacity as an officer are outside the purview of Section 102(b)(7)."[124]

As to Evans and Levinson, Plaintiffs rely on the allegations against them as directors to support their claim for breach of loyalty as officers.[125] For the reasons stated above, those claims support inferences that Evans and Levinson were conflicted with respect to the Merger and that those conflicts manifested a deal that was not entirely fair.[126]

Plaintiffs do not make much of an attempt to allege a breach of the duty of loyalty or care in connection with the sale process as to Nalevanko. As to loyalty, Plaintiffs argue Nalevanko "counseled Evans and Levinson in their negotiations with bidders, including Evans's decision to demand a $2.75 billion valuation from NVIDIA and participated in a 'term sheet discussion' with Qatalyst that likely yielded Zoox's

---

[124] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994).

[125] *See* Am. Compl. ¶¶ 181–84.

[126] *See supra* Part II.A.2.

$1.3 billion counter proposal."[127] They argue Nalevanko was "motivated by the financial benefits he stood to obtain in a transaction with Amazon."[128]

Even if Nalevanko was motivated by personal financial benefits, Plaintiffs' allegations with respect to any involvement in the sale process or misconduct by him are too thin to support an inference that he breached his duty of loyalty. Plaintiffs allege he was present for or provided advice as to some of the negotiations Evans and Levinson conducted, but these allegations are makeweight, and they do not allege any participation by him other than those communications.[129] Nor have Plaintiffs identified any post-Merger statements by Nalevanko similar to those made by Evans and Levinson to help explain his intentions during the sale process. Plaintiffs fail to plead a sale-process claim as to Nalevanko.

Plaintiffs also claim that Nalevanko breached his disclosure obligations in connection with the Information Statement. It is reasonably conceivable that Nalevanko participated in the preparation and dissemination of the Information Statement. General Counsel usually do.[130] The question is whether Plaintiffs have alleged disclosure deficiencies, which this decision reserves for supplemental briefing.

---

[127] Pls.' Opposition Br. at 49 n.14.

[128] *Id.*

[129] *See* Am. Compl. ¶¶ 62 ("On May 6, after consulting with Qatalyst, Levinson, and Nalevanko, Evans sent back a revised term sheet [to NVIDIA] reflecting a $2.75 billion valuation."), 69 ("[O]n May 10, Evans, Levinson, Nalevanko, and Foster had a 'term sheet discussion' with Qatalyst. Not long after . . . Qatalyst sent Zoox's counterproposal.").

[130] *See, e.g.*, *Elec. Last Mile Sols., Inc. S'holder Litig.*, 2024 WL 223195, at *5 (Del. Ch. Jan. 22, 2024) (finding that certain officers' involvement in "high-level parts of the transaction, including negotiating the letter of intent and Merger Agreement . . .

Any sale-process claim asserted against Nalevanko is dismissed.  The motions to dismiss are otherwise denied as to Count II.

## C.    Count III Against Amazon

In Count III, Plaintiffs claim that Amazon aided and abetted the other Defendants' breaches of fiduciary duties.  "To state a claim for aiding and abetting, the plaintiffs must allege that [a third-party] knowingly participated in [a] breach of fiduciary duty."[131]  "Knowing participation in a board's fiduciary breach requires that the third-party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[132]  "A plaintiff must plead meaningful facts to support an inference that the acquirer attempted to create or exploit conflicts of interest on the board or otherwise conspired with the directors to engage in a fiduciary breach."[133]

For the reasons stated above, Plaintiffs plead facts sufficient to support the inference that five of the Board's eight members were conflicted with respect to the Merger.  But even if Amazon was aware of those conflicts, Plaintiffs fail to plead the company took any actions to exploit them.  Amazon made compromises that were beneficial to the common stockholders throughout the sale process.  Amazon agreed

alongside the company's contractual obligation [to advise an acquirer of necessary amendments] raises an inference that [they] reviewed the Proxy"); *Morrison v. Berry*, 2019 WL 7369431, at *25 (Del. Ch. Dec. 31, 2019) ("Given [the defendant's] role as General Counsel, and given the sales process as pled, [the court] can infer that the omitted facts were omitted [from the Schedule 14D-9] with his knowledge.").

[131] *In re Mindbody, Inc., S'holder Litig.*, 2021 WL 5834263, at *5 (Del. Ch. Dec. 9, 2021).

[132] *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001).

[133] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 175 (Del. Ch. 2023) (citations omitted).

to Zoox's first counterproposal, which more than doubled its initial asking price of $600 million. When the deal almost fell through because of infighting over the Bonus Plan, Amazon agreed to fund 30% of it, even though the May term sheet did not provide for Amazon to fund *any* portion of the plan. To the extent that Plaintiffs argue Amazon attempted to seize on conflicts within the Board to its benefit, the facts pled support an inference that Amazon did a bad job of it. Zoox extracted concessions from Amazon that benefitted all its equityholders at nearly every turn. That is not a basis from which the court can infer Amazon knowingly participated in a fiduciary breach.[134]

Count III of the Amended Complaint is dismissed.

### D. Count IV For Attorneys' Fees

In Count IV, Plaintiffs request payment of their attorneys' fees incurred in the appraisal action, as well as a declaration that the fees incurred by Zoox in the appraisal action are not indemnifiable under the Merger Agreement due to bad-faith litigation misconduct by certain Defendants.

---

[134] *See Morgan v. Cash*, 2010 WL 2803746, at *7 (Del. Ch. July 16, 2010) (dismissing aiding and abetting claim where the plaintiff did "not pled any facts showing that [the acquirer] actually attempted to exploit the [target] board's alleged conflicts" or "that the [target] board was so radioactively conflicted that any contact with that board to do a deal—even arm's-length negotiating—was aiding and abetting wrongdoing"); *Repairman's Serv. Corp. v. Nat'l Intergroup, Inc*, 1985 WL 11540, at *9 (Del. Ch. Mar. 15, 1985) (denying aiding and abetting claim because "there was intensive arm's-length bargaining between the parties with demands made and concessions granted on both sides").

Delaware courts follow the American Rule that each party is expected to pay its own attorneys' fees regardless of the outcome of the litigation.[135] The court, however, retains the ability to shift fees when faced with vexatious litigation conduct "to deter abusive litigation and to protect the integrity of the judicial process."[136] "Delaware courts have shifted fees for glaringly egregious conduct, such as forcing a plaintiff to file suit to secure a clearly defined and established right, unnecessarily prolonging or delaying litigation, falsifying records, or knowingly asserting frivolous claims."[137] The exception applies in extraordinary cases.[138] This is not one of them.

Plaintiffs allege that Amazon, Zoox, and the Officer Defendants engaged in "bad faith litigation misconduct in connection with *Wei v. Zoox, Inc.*, C.A. No 2020-1036-KSJM (Del. Ch. filed Dec. 7, 2020), by delaying the production of, and concealing the existence of, critical documents[.]"[139] The Amended Complaint alleges that Defendants made misrepresentations about and wrongfully postponed producing certain draft term sheets and a payment waterfall relaying how the Merger proceeds would be distributed.[140]

---

[135] *See Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966) ("[A] litigant must, himself, defray the cost of being represented by counsel.").

[136] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).

[137] *Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at *1 & nn.7–8 (Del. Ch. July 22, 2021) (cleaned up) (compiling cases).

[138] *See RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015).

[139] Am. Compl. ¶ 190.

[140] *See id.* ¶¶ 150–69.

As noted above, Plaintiffs received information about the Merger through discovery in an appraisal action. Discovery in the appraisal action was, as it often is, iterative.[141] The parties disputed and redrew boundary lines about sources of collection and types of information subject to production, and ultimately, Zoox produced the documents that Plaintiffs allege were wrongfully withheld.[142] Plaintiffs' allegations support an inference that adversarial parties were zealously litigating[143] unusual discovery circumstances. They do not support an inference that Defendants' conduct rose to the level of bad faith.[144]

Count IV is dismissed.

---

[141] *See Zoox*, 268 A.3d at 1223 (ruling that Plaintiffs were entitled to Section 220 materials); *Wei v. Zoox, Inc.*, 2023 WL 5046758 (Del. Ch. Jan. 17, 2023) (ORDER) (granting Plaintiffs' request for a Rule 30(b)(6) deposition and noting that if after the deposition, Plaintiffs can "show that additional documents are necessary and essential to meet the identified gaps, they may engage in further meet-and-confers with [Zoox] or seek relief from the court as necessary").

[142] *See* Am. Compl. ¶¶ 163–67.

[143] *See Wei v. Zoox, Inc.*, C.A. 2020-1036-KSJM, Dkts. 42 (granting in part Zoox's motion for a protective order), 59 (granting in part Zoox's second motion for a protection order but permitting Plaintiffs to conduct Rule 30(b)(6) deposition of a Zoox representative).

[144] *See, e.g.*, *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 507–08 (Del. 2005) (affirming decision finding bad-faith litigation conduct where the plaintiff had an improper motive for filing the action; "made excessive and duplicative deposition requests while ignoring their own discovery obligations"; and had a key witness refuse to answer questions in his deposition, which behavior was supported by the plaintiff's attorney); *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998) (affirming decision finding bad-faith litigation conduct where the defendants defended an action despite knowing they had no valid defense, asserted frivolous motions, falsified evidence, and altered their testimony to "suit their needs"); *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, *7–9 (Del. Ch. July 7, 2023) (finding bad-faith litigation conduct where, in response to a Section 220 demand, a company: refused to produce a single document; insisted on deposing a Florida witness in Delaware, requiring the plaintiff to obtain a protective order; insisted on

## III. CONCLUSION

Defendants' motions to dismiss are granted in part and denied in part as follows: The sale-process claims in Count I are dismissed as to Yoler and Cooperman only, the motions are otherwise denied as to the remaining sale-process claims in Count I. The sale-process claims in Count II are dismissed as to Nalevanko only, and the motions are otherwise denied as to the remaining sale-process claims in Count II. Counts III and IV are dismissed in their entirety.

This decision side-stepped the disclosure issues, mainly because the parties did not neatly join issue as to those claims. The parties should meet and confer as to the scope of Plaintiffs' disclosure claims. What theories are Plaintiffs pressing as to which Defendants? And (wishful thinking, but) does this decision obviate any of the

---

calling the plaintiff as a live witness even though the proceeding "plainly could have [] proceeded on a paper record"; changed its legal argument in a way that would prevent the plaintiff from taking discovery to which he was entitled; and made multiple misrepresentations to the court); *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461 (Del. Ch. Nov. 24, 2020), *judgment entered*, (Del. Ch. 2020) (finding bad-faith litigation conduct where, after refusing to "provide even a single document" in response to several Section 220 demands, the defendant took an "unsupported" position on the plaintiffs' purposes for inspection and included "misleading" citations that "amount[ed] to misrepresentations of the record" in filings submitted to the court); *Carlson v. Hallinan*, 925 A.2d 506, 546 (Del. Ch. 2006), *opinion clarified*, 2006 WL 1510759 (Del. Ch. May 22, 2006) (finding bad-faith litigation conduct where, in response to receiving a request to inspect books and records from a director, a company made a "bad faith attempt to deny [the director] something to which he was clearly entitled" by "attempt[ing] to remove [him] as a director . . . two days after he formally requested documents"); *McGowan v. Empress Entm't, Inc.*, 791 A.2d 1, 5 (Del. Ch. 2000) (finding bad-faith litigation conduct where, in response to receiving a director's request for books and records, a company "falsely promis[ed] to produce corporate records that [the director] was clearly entitled to inspect, and . . . forc[ed] [the director] to file this lawsuit to vindicate a claim against which [the company] had no valid defense").

47

allegations or dismissal arguments as to the disclosure claims?  Once the issues are crystalized, the parties may submit short supplemental letters stating what dismissal arguments require the court's attention.  The parties must cite the portions of the briefing where those arguments were preserved and, if they were not preserved but are fair to consider, state why.